UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CASH FX GROUP S.A.; THE CONVERSION PROS, INC.; HUASCAR JOSE LOPEZ CASTILLO; RONALD POPE; and JUSTIN HALLADAY,**<br><br>**Defendants.** | **Civil Action No. 3:26-cv-2573** |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF, AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**

Plaintiff Commodity Futures Trading Commission ("Commission"), by and through its attorneys, alleges as follows:

## I. SUMMARY

1. From at least June 28, 2019 through at least December 20, 2023 (the "Relevant Period"), Huascar Jose Lopez Castillo ("Lopez") and his company Cash FX Group S.A. ("Cash FX"); Ronald Pope ("Pope") and his company The Conversion Pros, Inc. ("TCP"); and Justin Halladay ("Halladay"; and together with Lopez and Pope, the "Individual Defendants"; and collectively with all

defendants, "Defendants") jointly engaged in a fraudulent, multilevel marketing ("MLM") Ponzi scheme. Defendants solicited members of the public ("pool participants") to participate in a commodity pool operated by Cash FX (the "Cash FX Pool"). In its solicitations, Cash FX represented, among other things, that it would use pooled funds to trade off-exchange leveraged, margined, and/or financed retail foreign currency ("forex") through a combination of professional traders, proprietary "bots," and artificial intelligence.

2. To generate interest in Cash FX and recruit new members, certain Defendants falsely promised pool participants up to 15% weekly returns on Cash FX's pooled forex trading; vouched for Cash FX's purportedly unique and transparent business structure, claiming that Cash FX was a "legacy company" that would "change the world"; and praised the "moral values" of the other Individual Defendants based on their allegedly long-standing relationships.

3. In reality, Cash FX was a scam. Cash FX engaged in, at most, de minimis forex trading, using less than one percent of the pool participant funds that it received for that purpose. Cash FX misappropriated all or nearly all of the remaining pool participant funds, making Ponzi payments to other pool participants (pretending that these were forex trading returns) and distributions to the Individual Defendants for their personal use. Cash FX also provided false account statements to pool participants to perpetuate the lie that Cash FX was

generating large trading returns. The fraud, however, did not end with the solicitation of pool participants, the misappropriation of their funds, and their misrepresentations regarding trading returns. At various times during the Relevant Period, Cash FX was either unable or otherwise failed to meet pool participants' withdrawal requests in a timely manner. To justify these delays and maintain their fraudulent scheme, certain Defendants offered pretextual explanations to pool participants, such as third-party attacks on the Cash FX platform that purportedly caused payment delays. Certain Defendants also omitted material facts throughout the Relevant Period, including that Cash FX did not engage in significant forex trading and lacked legitimate records indicating such trading, and failed to correct or retract prior public statements that were false.

4. Throughout the Relevant Period, over 400,000 accounts, more than 6,000 of which were owned by U.S. residents, were funded by pool participants who paid over $950 million to Cash FX, at least $27 million from U.S. residents, to participate in the Cash FX Pool. In total, while certain pool participants received their investments back in the form of Ponzi payments, approximately 81% of pool participants collectively lost at least $406 million as a result of Defendants' scheme.

5. As detailed herein, by this conduct and the conduct further described, Defendants—either directly or as controlling persons—have engaged, are engaging, and/or are about to engage in acts and practices in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-26, and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1-190 (2026).

6. Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as more fully described herein.

7. Accordingly, the Commission brings this action pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the CEA and Regulations. The Commission also seeks civil monetary penalties, restitution, disgorgement, rescission, trading and registration bans, pre- and post-judgment interest, and any other equitable and ancillary relief as the Court may deem just and proper.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, 7 U.S.C. § 13a-1(a) authorizes the Commission to seek injunctive and

other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder, and provides that U.S. district courts "shall have jurisdiction to entertain such actions."

9. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because one or more Defendants are found in, inhabit, or transact business in this District, and because acts and practices in violation of the CEA and Regulations have occurred within this District.

## III. THE PARTIES

10. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the CEA and Regulations.

11. Defendant **Cash FX Group S.A.** was incorporated in Panama City, Panama, on May 22, 2018, maintained its principal place of business in Panama, and was originally named Dulop More Rich Investments, S.A. On July 24, 2019, Dulop More Rich Investments, S.A. was renamed Cash FX Group S.A. Cash FX was legally dissolved and liquidated in October 2022. Despite dissolution, Cash FX continued operations throughout the Relevant Period. Cash FX has never been registered with the Commission.

12. Defendant **The Conversion Pros, Inc.** is a Nevada corporation that was formed in 2016. During the Relevant Period, TCP maintained its principal place of business in Carson City, Nevada. TCP has never been registered with the Commission.

13. Defendant **Huascar Jose Lopez Castillo** is a resident of Brazil and citizen of the Dominican Republic. During the Relevant Period, he resided in the Dominican Republic. Throughout the Relevant Period, Lopez served as the Chief Executive Officer ("CEO") of Cash FX, operated and controlled Cash FX, managed and directed other Cash FX employees who acted on Cash FX's behalf, and acted as an associated person ("AP") of Cash FX. Lopez has never been registered with the Commission.

14. Defendant **Ronald Pope** is a resident of Salem, Oregon. During the Relevant Period, Pope was a resident of Henderson, Nevada. Throughout the Relevant Period, Pope served as the President and CEO of TCP, operated and controlled TCP, managed and directed other TCP employees who acted on TCP's behalf, appeared in multiple videos listed as an official representative of Cash FX (for example, speaking above a chyron reading "Ron Pope, Cash FX"), and acted as an AP of Cash FX. Pope has never been registered with the Commission.

15. Defendant **Justin Halladay** is a resident of Cocoa, Florida. During the Relevant Period, Halladay was a resident of Green Cove Springs, Clay

County, Florida, appeared in multiple videos listing him and describing himself as a leader of the "Cash FX Power Team," and acted as an AP of Cash FX. Halladay has never been registered with the Commission.

## IV. FACTS

### A. Overview of Cash FX's Operations and Structure.

#### 1. Cash FX Operated as an MLM Scheme.

16. Cash FX operated as an MLM scheme, meaning that each pool participant who contributed to Cash FX could earn income simply by recruiting additional pool participants to contribute to Cash FX. Cash FX used the term "downline" (in this Complaint, a pool participant's "Pyramid") to refer to "the members you have personally sponsored into [Cash FX] or who have been sponsored into [Cash FX] from someone you sponsored, or someone they sponsored, etc., and whose sales or referrals also generate income for you." A pool participant's Pyramid contained the pool participant at the top; a first layer below the pool participant, consisting of individuals the pool participant recruited; a broader, second layer below the first-layer recruits, consisting of individuals recruited by the first-layer recruits; and so on.

17. Pool participants contributed to the Cash FX Pool by purchasing Cash FX Trade Contracts (in this Complaint, a pool participant's "Contribution") ranging in price from as little as $300 to as much as $100,000. Cash FX promised

pool participants that 70% of each Contribution would be used for forex trading, and the remaining 30% would pay for the pool participants' access to an "Academy Program" designed to teach pool participants to trade forex themselves. Cash FX promoted the forex markets as an opportunity for pool participants to leverage their capital to maximize gains.

18. Defendants communicated that, for each Contribution, a pool participant could earn up to two times the amount they contributed in the form of "bear capital" (in this Complaint, "Trade Returns") and up to an additional two times the amount they contributed in the form of "bull capital" (in this Complaint, "Pyramid Returns").

19. Trade Returns were comprised of: (1) returns from purported forex trading; and (2) a "Forced Matrix" bonus rewarding the pool participant for their new Contributions.

20. Pyramid Returns were comprised of bonuses for recruiting additional pool participants into the Cash FX Pyramid, specifically: (1) a "Fast Start" bonus to a pool participant any time a member of that pool participant's Pyramid made a Contribution; (2) a "Uni-Level" bonus rooted in the size of the pool participant's Pyramid; and (3) additional bonuses (for example, a "Matching Matrix Bonus," a "Global Leadership Bonus," and a "Matching Global Leadership Bonus") similarly rooted in the size of a pool participant's Pyramid.

21. Pool participants were promised they would begin to see trade earnings post to their account in the Cash FX back-office portal three business days after making a Contribution.

22. Once a pool participant had earned twice the amount of their Contribution in Trade Returns and Pyramid Returns, the pool participant had three options to earn additional returns: (1) make a new Contribution at the same level as before; (2) make a larger Contribution at a higher level than before; or (3) withdraw their funds. Before pool participants could make new Contributions, Cash FX first required them to "withdraw" the money they had previously contributed, triggering a 20% withdrawal fee that was purportedly disbursed back into Cash FX's commission and bonus structure.

23. Cash FX pool participants were permitted to earn Pyramid Returns on one personal account as well as additional accounts if in the name of an entity. In some instances, pool participants set up more than one account in an attempt to bolster their Pyramid and increase their Pyramid Returns potential.

24. In total, the Cash FX scheme consisted of more than 400,000 pool participant accounts, more than 6,000 of which were owned by U.S. residents, and accepted more than $950,000,000 in retail investor funds, at least $27,000,000 from U.S. residents, for the purported purpose of pooling 70% of those funds to

trade forex and utilizing the remaining 30% of funds for an Academy Program to teach pool participants to trade forex.

**2. The Individual Defendants Were at the Top of the Cash FX Pyramid.**

25. In or around May 2019, Lopez recruited Pope to assist in creating the Cash FX scheme. Lopez founded and controlled Cash FX and Pope created the infrastructure that helped make it a success. Lopez knew Pope from work on prior ventures. In the MLM industry, Pope was well known for working with MLM entities and their members to market their MLMs. In or around July 2019, Pope recruited Halladay into the Cash FX scheme. In or around August 2019, Pope traveled from his home in Nevada, and Halladay traveled from his home in Florida, to Orlando, Florida to meet with Lopez to discuss and plan the launch of Cash FX. At that time, Halladay had an extensive online following of members of the public relating to various projects and investments. Halladay provided Cash FX with access to his followers, and the endorsements and social media marketing Cash FX needed to recruit pool participants. The Individual Defendants joined together to operate the Cash FX scheme and defraud the public, with the goal of each making millions or tens of millions of dollars.

26. As early "members" in the Cash FX scheme, each of the Individual Defendants sat at or near the top of the Cash FX Pyramid and were positioned to earn significant Pyramid Returns from their own massive Pyramids. Lopez sat at

the top of the Cash FX Pyramid, Pope sat directly under Lopez, and Halladay sat directly under Pope. Of the Cash FX scheme's more than 400,000 pool participant accounts, 100% of them were credited to both Lopez and Pope's Pyramids, and approximately 95% were credited to Halladay's Pyramid.

27. The Individual Defendants quickly profited from their positions in the Cash FX scheme. Cash FX, by and through Lopez, began transferring funds to each Individual Defendant shortly after pool participants began contributing funds to Cash FX. The first pool participant contributed to Cash FX on or about July 5, 2019. Cash FX, by and through Lopez, made its first transfer to Lopez at least as early as July 10, 2019; and to Pope and Halladay at least as early as July 29, 2019.

**3. TCP and Pope Provided Essential Back Office Support for Cash FX's Operations and Solicited the Public to Participate in the Cash FX Scheme.**

28. TCP's core business during the Relevant Period was developing software and tools for MLM participants to market their platforms, build websites, and manage and automate communications with members.

29. Cash FX engaged TCP to establish the Cash FX "back office"— essentially, to create a platform that could direct and log pool participant Contributions, calculate pool participant commissions, log purported trade results, provide pool participants access to view their purported account

balances, accept withdrawal requests, log payouts to pool participants, and provide ongoing support for those services. In short, TCP and Pope created and provided the technical infrastructure that enabled Defendants to carry out this fraudulent scheme.

30. In this role, Pope and TCP possessed detailed records regarding Cash FX pool participants, funds received from and paid out to pool participants, alleged trading returns that had been entered manually into the back-office system by Lopez, and purported bonuses earned by pool participants. In practice, Lopez closely coordinated—often daily or multiple times during the day—with Pope and a TCP programmer ("Employee 1") to address issues surrounding Cash FX's efforts to accept pool participant funds, process withdrawals by pool participants, resolve technical issues with the Cash FX website and platform, and communicate with pool participants.

31. Importantly, TCP, through Pope, did much more than simply provide services to Cash FX. When encouraging prospective pool participants to contribute to Cash FX, Pope (who often introduced himself not just as a representative of Cash FX, but as President and CEO of TCP) touted TCP's uniquely effective marketing tools that would be available to Cash FX members to recruit larger Pyramids.

32. Pope and TCP had a strong incentive to recruit as many pool participants as possible to Cash FX. TCP earned money for work performed for Cash FX based on the number of active Cash FX pool participants.

33. When Pope fraudulently solicited prospective pool participants to join Cash FX and perpetuated the fraudulent scheme described herein, he did so in two separate capacities. First, he did so on behalf of Cash FX as an AP of Cash FX. Second, Pope did so on behalf of TCP in his capacity as the President and CEO of TCP, which independently stood to gain from the fraudulent solicitation of members of the public to participate in Cash FX.

**B. Defendants Misappropriated All or Nearly All Pool Participant Funds.**

34. The central promise underlying the Cash FX scheme—that it would profitably trade pool participant funds in forex markets, generating revenue to pay pool participants—was a lie. Cash FX engaged in, at most, de minimis forex trading.

35. Cash FX, facilitated by the back office created by TCP, directed pool participants (including U.S. pool participants) to send funds (*i.e.* bitcoin) to specified wallets on the blockchain. In many instances, Cash FX directed pool participants to transfer their bitcoin to Cash FX wallets, sometimes through third-party payment processors. In other instances, Cash FX directed pool participants to transfer their bitcoin directly into at least one of Lopez's personal

wallets. Lopez then either held the pool participants' bitcoin in wallets he controlled, or he transferred the bitcoin (or after exchanging it into another digital asset transferred the funds in that other digital asset) to other wallets he controlled, including to a personal account he controlled at a major cryptocurrency exchange ("Cryptocurrency Exchange #1") in the name of his wife or girlfriend and associated with Lopez's email address ("Lopez Account #1"). Pope and TCP had visibility into and kept detailed records of pool participant funds sent to Cash FX (including U.S. pool participants' funds) and withdrawals paid to pool participants (including U.S. pool participants). Pool participants' funds were misappropriated when Cash FX failed to trade the funds as promised and when Individual Defendants received pool participant funds purportedly derived from trading returns that Individual Defendants knew or were reckless in not knowing did not exist because Cash FX was not generating trading returns.

**1. Misappropriated Funds Were Used to Make Ponzi Payments.**

36. A Ponzi scheme is a fraudulent scheme where fraudsters falsely promise to use investor money for some purpose (*e.g.*, to invest in a particular market and pay out profits from those investments) and instead use new investor money to pay existing investors, thereby concealing and perpetrating the underlying fraud.

37. Cash FX was a Ponzi scheme from start to finish, using funds contributed by new or existing pool participants to satisfy other pool participants' withdrawal requests. Each Defendant knew or was reckless in not knowing that pool participants' funds were used to make Ponzi payments.

38. An example of this misuse occurred in April 2021, when Cash FX made nearly instantaneous Ponzi payments with pool participant funds. Between April 11 and 14, 2021, Cash FX received into certain wallets it controlled approximately 0.374 BTC, worth around $23,404, from approximately 19 pool participants. On April 14, 2021, Cash FX utilized those funds, as well as a small volume of additional funds, to transfer approximately 0.393 BTC, worth around $24,703, in Ponzi payments to approximately 50 different pool participants.

39. Similarly, in November 2021, Cash FX made Ponzi payments with pool participant funds. Between October 20 and November 4, 2021, Cash FX received into certain wallets it controlled approximately 1.372 BTC, worth around $85,363, from approximately 27 pool participants. On November 7, 2021, Cash FX utilized those funds from those 27 pool participants to transfer approximately 0.743 BTC, worth around $46,202, in Ponzi payments to approximately 72 different pool participants.

40. Lopez often paid pool participants from Lopez Account #1. For example, on June 9, 2020, Lopez paid a pool participant approximately 11.36

BTC, worth around $111,000, from this account. Additionally, on June 27, 2022, Cash FX transferred approximately 58.45 BTC, worth around $1.2 million, into Lopez Account #1. That same day, Lopez sold approximately 75 BTC for around $1.5 million USDT from Lopez Account #1 and then transferred approximately $1.4 million USDT to a pool participant who was a significant promoter of Cash FX with a large Pyramid.

**2. Individual Defendants Knowingly or Recklessly Misappropriated Pool Participant Funds by Taking Commissions Based on Non-Existent Trading Returns.**

41. As discussed above, Lopez owned and controlled Cash FX, including the wallets that received and distributed pool participant funds. Lopez also sat at the very top of the Cash FX Pyramid and thus received significant Pyramid Returns with the recruitment of each new pool participant. Lopez knew or was reckless in not knowing that he was misappropriating pool participant funds by taking those commissions because the purported source of those commissions, *i.e.*, Cash FX's profitable trading, did not exist. During the Relevant Period, Cash FX, by and through Lopez, transferred to personal wallets Lopez owned and/or controlled, including Lopez Account #1, at least $121 million of misappropriated pool participant funds. Ultimately, Lopez retained and used for his own personal benefit at least $96 million of those funds.

42. Pope sat directly under Lopez in the Cash FX Pyramid and thus received significant Pyramid Returns with the recruitment of each new pool participant. Pope knew or was reckless in not knowing that he was misappropriating pool participant funds by taking those commissions because the purported source of those commissions, *i.e.*, Cash FX's profitable trading, did not exist. In addition, TCP's agreement with Cash FX provided that Cash FX would pay TCP a monthly fee for each active pool participant in Cash FX. During the Relevant Period, Cash FX, by and through Lopez (including through Lopez Account #1), transferred to wallets controlled by Pope and/or TCP at least $15.4 million of misappropriated pool participant funds. Cash FX continued to pay Pope and/or TCP at least through October 7, 2023.

43. Halladay sat directly under Pope in the Cash FX Pyramid and thus received significant Pyramid Returns with the recruitment of each new pool participant. Halladay knew or was reckless in not knowing that he was misappropriating pool participant funds by taking those commissions because the purported source of those commissions, *i.e.*, Cash FX's profitable trading, did not exist. During the Relevant Period, Cash FX, by and through Lopez (including through Lopez Account #1), transferred to wallets controlled by Halladay at least $16 million of misappropriated pool participant funds. Cash FX continued to pay Halladay through at least June 29, 2022.

## C. Defendants Developed and Executed Cash FX's Fraudulent Marketing Strategy.

44. From the beginning of the Relevant Period, the Individual Defendants joined together to defraud the public and were the central players in marketing the Cash FX scheme. Together, they planned, created, and executed Cash FX's marketing strategy. Defendants devised a strategy of advertising Cash FX in videos (targeted at, and viewed by, U.S. and other pool participants), emails (targeted at, and sent to, U.S. and other pool participants), and other media (targeted at, and accessed by, U.S. and other pool participants) that would allow them to maximize their reach to potential pool participants for the Cash FX scheme. They did this by recording videos, drafting emails, and creating digital presentations that could be used and shared easily and repeatedly—both by Defendants and unwittingly by pool participants hoping to use the advertisements to solicit new pool participants and benefit from Pyramid Returns. Pope and Halladay, who lived in the United States during the Relevant Period, recorded multiple videos from the United States. The Individual Defendants acted on behalf of and as agents and APs of Cash FX; and Pope acted on behalf of and as an agent of TCP, which independently profited from pool participants joining Cash FX.

45. When the Individual Defendants participated in recorded videos related to Cash FX, they did so with the knowledge and intent that the videos be

shared publicly and utilized by newly recruited pool participants to solicit additional participants in the future.

46. In Cash FX's welcome emails during the Relevant Period, Lopez explicitly encouraged new pool participants to use Cash FX videos to recruit additional pool participants: "Do you know how easy it is to get people to join while YOU reap the rewards? Simply let us do the telling and selling for you . . . . Go to our YouTube channel here and send them our latest Business Presentation to watch. It's that easy!"

47. In a video recorded on or about September 25, 2019, and subsequently posted to YouTube, Pope stated that TCP had "developed multiple videos," which were "marketing tools" that would be "made available to [pool participants]."

48. In July 2019, the Individual Defendants recorded a video that was subsequently posted to YouTube to recruit pool participants into the Cash FX scheme. In that video, Halladay encouraged viewers to "get back to one of us or whoever shared this video with you."

49. When Lopez, Pope, and Halladay asked pool participants to share their videos to recruit additional pool participants, including the videos referenced herein, they knew that certain Cash FX pool participants were based in the United States. Thus, Lopez, Pope, and Halladay recorded these videos

knowing and intending, or recklessly disregarding, that U.S.-based pool participants would view these videos, contribute to Cash FX in response to those videos, and use those videos to engage in such recruitment of other pool participants, including U.S.-based pool participants.

### 1. All Defendants Made Material Misrepresentations and Omissions About the Cash FX Scheme in Recorded Videos They Knew Would Be Shared to Recruit Additional Pool Participants.

50. During the Relevant Period, Defendants made material misrepresentations and omissions in their marketing materials to solicit members of the public to join Cash FX. For example, in a July 2019 welcome video in which all Individual Defendants joined together, appeared on screen, and solicited the public to contribute to Cash FX, Lopez made multiple false statements, including that unlike “scams” in the “network marketing” (MLM) space that use money from “new people . . . [to] pay old people[,]” Cash FX was different because it offered a real product, “leverage[ing] . . . [a] trading pool” to generate revenue sustainably in the forex markets. Pope promised that Cash FX would be a “20 year old . . . legacy company”: “that’s how it’s being built from the infrastructure side with the compliance, the legal, all those types of things that you don’t always see in . . . the network marketing industry.” And Halladay further promised that “we’re going to start to be releasing . . . more and more transparency so that we know, one, that our funds are safe; and we know, two,

that this is the real deal . . . ." This and many other videos described herein were released to the public on YouTube by Cash FX, with official Cash FX-branded graphics in the videos. Each such video, including ones like this in which Lopez (the Cash FX CEO), Pope, and Halladay appeared, reflects Cash FX's consent to each Individual Defendant marketing Cash FX on Cash FX's behalf, each Individual Defendant's consent to market on Cash FX's behalf, and Cash FX's control over the content being communicated by these Individual Defendants.

51. Defendants' fraudulent misrepresentations and omissions continued unabated throughout the Relevant Period. For example, in a video recorded on or about August 1, 2019, Lopez falsely stated, "I'm . . . not [being] cocky or anything . . . [but] what we have in terms of algorithm and trading and strategy, I don't think anyone has it in the whole world."

52. In a video recorded on or about August 26, 2019, and subsequently posted to YouTube, Halladay falsely asserted that 70% of pool participant funds would be the pool participant's money, that Cash FX would not touch that money, and that the money would work for the pool participant in the forex markets.

53. In a video recorded on or about September 9, 2019, and subsequently posted to YouTube, Pope asserted that "the life that you can live as a forex trader is pretty incredible" and that Cash FX was getting its "academy"

educational materials "accredited there in Panama." Lopez asserted that the motivation to start Cash FX was to help as many people as possible, noting that he and his trading team had profited so significantly from their trading "strategies . . . bots and algorithm," he decided that "we cannot hold this information we have, we can bless many peoples' lives."

54. In a video recorded on or about September 20, 2019, and subsequently posted to YouTube, Pope stated that he had personally traded forex for over 15 years and that Cash FX was a phenomenon. Pope claimed that he met Cash FX traders in Orlando, Florida and falsely stated that Cash FX was earning at least 15% per week. "I guess what I can say here guys is we're not dealing with a company that's struggling to meet that 15% a week obligation . . . . They actually do far beyond that . . . ." Pope falsely asserted, here and in a similar video on or about September 25, 2019, that Cash FX used live professional traders, proprietary algorithms, and AI to achieve its trading success. In this and multiple other videos described herein, Pope spoke above a chyron in the video reading "Ron Pope, Cash Forex Group," listing him in his official capacity as an agent of Cash FX.

55. In a video recorded on or about September 25, 2019, and subsequently posted to YouTube, Pope asserted that every time a Cash FX pool participant who had previously made a Contribution wished to make a new

Contribution, the pool participant first had to withdraw funds (incurring a 20% withdrawal fee). Pope falsely asserted that this was unavoidable: "You have to withdraw that money first, okay? That's a legality thing."

56. In a video recorded on or about January 12, 2020, and subsequently posted to YouTube, Halladay presented an overview of his own (or a supposed family member's) Cash FX "back office." He also showed supposed records falsely reflecting eight straight weeks of over $1,300 per week of trading profits on a $21,000 pool contribution.

57. In a video recorded on or about February 1, 2020, and subsequently posted to YouTube, Halladay falsely asserted that Cash FX had been averaging approximately 10% weekly trading results, with 90% positive trade execution, based on "the algorithms, the artificial intelligence [which] is all built in house and perfected by our own team of engineers. It's not something we bought and it's not for sale, yet it's worth millions of dollars."

58. In a video recorded on or about February 15, 2020, and subsequently posted to YouTube, Halladay assured the public that Cash FX was a legitimate business doing real trading, stating that he had met with Lopez and Cash FX's "regulated licensed broker" (EverFX) in Orlando to "ask them the difficult questions and verify that this is real. We got to meet the traders and verify that, yes, they are real." Halladay further stated that two professional traders he

knew said Cash FX's trading was "[a]bsolutely 100% verifiable." In this and other videos in which Halladay appeared and spoke on behalf of Cash FX, Halladay introduced himself as the leader of the "Cash FX Power Team," describing himself in his official capacity as an agent of Cash FX.

59. On or about March 28, 2020, the Individual Defendants appeared together again in a recorded video that was subsequently posted to YouTube. Pope falsely stated that Cash FX traded in the forex markets and explained that Cash FX did so because those markets allow for leveraging and compounding of capital to maximize gains. Pope showed photos of supposed Cash FX offices and said it "looks like Wall Street in there!"

60. In a video recorded on or about September 28, 2020, and subsequently posted to YouTube, Pope falsely stated, "I've seen the trade reports because I work with the legal team and they pass through me . . . I have seen those reports I have seen the trades . . . . They are real trades being indicated by the [Expert Advisor, *i.e.* trading bot]." Pope made these statements to give the false impression that Cash FX was trading forex as promised.

61. In a video recorded in or around November 2020, and subsequently posted to YouTube, Halladay participated in the video and introduced Lopez, who shared his vision for the company and stated they were not operating Cash FX to make money, but to help as many people as they could. Lopez stated,

"There are so many scams, and we want to bring hope to people that there is still something genuine out there."

62. In an August 25, 2021 email from Cash FX, Lopez stated that, to recruit new pool participants, pool participants can "show their prospects the results they are getting from the Trading Pool" but that "it MUST be done privately, NOT on social media or any other public forum!" The email encouraged pool participants to tell prospective pool participants "all about our proprietary AI and experts that **do the trading for you while you sit back** and watch." (Emphasis in original.)

63. In a video posted to YouTube on November 18, 2021, which has a caption stating it was livestreamed one day earlier, Cash FX's Marketing Director admitted for the first time that AI had not yet been deployed on behalf of Cash FX pool participants, making clear that all of Defendants' prior representations about AI had been false: "And, of course, there was always the intention for [Cash FX] to launch, uh, an AI as well, but it's a very, very slow process."

**2. Defendants Held Live Events to Create the Illusion That Cash FX Was a Real Business.**

64. On or about November 8-10, 2019, in a hotel ballroom in Panama City, Panama, Cash FX held a "grand launch event" to solicit members of the public to participate in Cash FX. The Individual Defendants joined together once again and, among others, spoke on stage at the event, touting Cash FX's

sophisticated approach to forex trading, showing supposed historical trading results, and offering advice on recruiting additional members to each pool participant's Pyramid.

65. On or about September 25, 2021, Cash FX held a "Grand Office Opening" in Panama, where the Individual Defendants joined together again to defraud pool participants. In a recorded video tour of the office taken that day and subsequently posted to YouTube, Halladay stated that "this event shows that [Cash FX] is a real company, an educational company, and a company that is focused on the next 20 years for our members." Halladay directed the camera to pan to televisions on a wall in the office and stated, "[M]any of you were here in November of 2019 when this was really just a shell of a building and you can remember all of the TVs that were lined up on this wall and as you can see right now live what are we doing? We're trading forex!"

66. In the same video, Halladay spoke to Pope. Pope described what he and TCP had been doing for Cash FX, representing that they were supporting Cash FX in growing and helping people internationally. Pope also attempted to reassure the public that Cash FX was legitimate, despite negative news: "Any company that starts up as a startup is going to go through you know those ups and downs the bumps and bruises, which Cash FX has gone through those and prevailed and I'm excited to see where it's going in the future."

67. In the same video, Lopez also addressed attendees, falsely asserting that Cash FX continued to have "geniuses working with AI" and that they had "great traders."

### D. Cash FX Provided False Account Statements and Information to Pool Participants.

68. During the Relevant Period, Cash FX provided false account statements (accessible through the Cash FX "Back Office" portal operated by TCP) and false account information, including that pool participants were earning Trade Returns from forex trading.

69. For example, on or about January 22, 2022, Cash FX sent a notification to a U.S. pool participant falsely stating that the pool participant had earned a commission: "Commission type: Trading Pool. Your commission now: $3,157.00. For more details, please see your CashFX Back Office. Once in your Back Office, you will choose the 'Finance' tab. Then you will want to choose 'Balance'." The statement that the pool participant had earned a $3,157.00 commission from forex trading was false and designed to perpetuate the lie that Cash FX was trading forex and generating returns for pool participants.

70. Similarly, on June 24, 2023, Cash FX sent a similar notification to another U.S. pool participant falsely stating that the pool participant had earned a commission: "Commission type: Trading Pool. Your commission now: $200.90. For more details, please see your CashFX Back Office." The statement

that the pool participant had earned a $200.90 commission from forex trading was false and designed to perpetuate the lie that Cash FX was trading forex and generating returns for pool participants.

71. Pool participants (including U.S. pool participants) received frequent, if not weekly, e-mails from Cash FX detailing falsified individual purported trading profits.

72. In truth and in fact, the account statements sent to participants, and the purported gains described therein, were not real as Cash FX had engaged in only de minimis forex trading.

**E. Defendants Knew or Recklessly Disregarded That Cash FX Was a Fraud.**

**1. Lopez Knew That Cash FX Was a Fraud.**

73. Because Lopez controlled the relevant Cash FX wallets and disposition of funds, Lopez knew that Cash FX was engaging in, at most, de minimis forex trading and instead was a Ponzi scheme, misappropriating pool participant funds and using new pool participant funds to satisfy withdrawal requests of other pool participants. Every material misstatement and omission made by Lopez and Cash FX were made with knowledge of their falsity.

### 2. Based on Cash FX Records They Possessed and Private Discussions with Lopez, Pope and TCP Knew or Recklessly Disregarded That Cash FX Was a Fraud.

74. Pope and TCP, in their role operating Cash FX's "back office," possessed records clearly indicating from the outset that Cash FX was a fraud. First, Lopez manually entered the daily trade return rate for the purported trading pool (with the exception of several days, where he requested Employee 1 (copying Pope) to manually enter a specified rate for him), providing no evidence or ability to verify whether such trading had actually occurred with the asserted returns (which it had not). Second, from July 2019 through July 2023, Cash FX supposedly never had a losing day in the global forex markets—every daily trade return rate entered by (or directed to be entered by) Lopez was positive. Third, Lopez routinely entered the supposed trade return rate well in advance of the actual supposed trade date. For example, on July 15, 2019, Lopez entered rates through July 25, 2019. Pope knew that Lopez fraudulently entered trade results for future dates—on or about January 19, 2020, Pope sent a message to Lopez stating, "I noticed you do not have any trade rates set for today and beyond. Just letting you know you might want to do that or it won't pay out [Trade Returns] today." Lastly, from at least December 2021 through at least April 2023, Pope repeatedly messaged Lopez that Cash FX was behind on

payments to TCP, reflecting Pope's knowledge of Cash FX's deteriorating financial condition and inability to pay its bills throughout the Relevant Period.

75. Pope's private chats with Lopez also show that Pope knew or recklessly disregarded that Cash FX was a fraud. On or about December 11, 2019, the UK Financial Conduct Authority issued a warning that Cash FX "may be providing or promoting financial services or products without our permission. You should avoid dealing with this firm and beware of scams." Pope messaged Lopez in a written chat, stating that "[w]e need to go over several items like . . . the UK compliance warning as I am getting asked about it and I need to know what to say."

76. On or about February 7, 2020, Pope messaged Lopez that a prominent member of Pope's Pyramid had complained to him that Cash FX's traders did not appear to be real traders—for example, the member told Pope that one supposed trader was actually a part-time tour guide, and according to Cash FX, they all supposedly became forex traders the exact same year.

77. On or about December 14, 2020, Lopez sent Pope a link to a BehindMLM.com article reporting that Cash FX's supposed broker, EverFX, was claiming it had no relationship with Cash FX. The article stated that "it's still amusing to see a Ponzi scheme caught out in its own web of lies." Lopez wrote

to Pope, "anyways nothing new for the readers . . . we just hope this [doesn't] get to FCA before everfx get[s] his licen[se] approve[d]."

78. On or about February 26, 2021, Pope witnessed Lopez retroactively falsify trade return data. Employee 1 messaged Lopez and Pope that an "admin" account had retroactively reduced a previous day's trade rate from 1.110% to 0.910%. Lopez explained that it must be a "system glitch." Employee 1 wrote to Lopez, copying Pope, "[W]e checked the logs. [I]t was your account. We are adding to the list to make sure it only allows updates on days that have not been run yet." Pope then replied, "So to be clear Wednesday 0.910% Thursday 1.110."

79. On or about March 25, 2021, Lopez and Pope discussed negative online commentary about Cash FX. Lopez wrote, "I'm throwing a pile of money to [a] PR Firm to bur[y] all that crap on the internet." In response, Pope noted the related challenge of a U.S. state's Secretary of State's office "still poking around and asking questions."

80. On or about June 28, 2021, on a discussion thread including Pope, Lopez and Employee 1 discussed that the fluctuating price of bitcoin (as opposed to forex trading returns) determined whether Cash FX could make payouts. Lopez messaged Pope and Employee 1, noting that Cash FX was "officially . . . a month delayed in the payouts." Employee 1 noted that Lopez had set a minimum bitcoin price to allow payouts, and that bitcoin had been below that

price. Pope knew, or should have known, that if Cash FX was generating large returns trading forex, the price of bitcoin should not have determined whether Cash FX could make payouts.

81. On or about January 14, 2022, Lopez, Pope, and Employee 1 had a discussion making clear to Pope, yet again, that Cash FX was a fraudulent scheme. At this time, multiple pool participant withdrawal requests were being cancelled, and Lopez messaged Employee 1 and Pope blaming "hackers" for the cancelled withdrawals and asking them to address the issue. Upon investigating, Employee 1 communicated that it was Lopez's account at Lopez's own IP address that had cancelled the withdrawals at issue. Lopez reacted angrily, writing "FUCKING INSANE SHITTTT HAHAHAHAHAHAHAHA YOU CAN NOT IMAGINE HOW FUCKING FRUSTRATING IS THIS....ME NOT SLEEPING TRAYING [sic] TO PAY THE NETWORK AND THE SYSTEM SOBOTASH [sic] ME TO NOT ACHIEVING THIS . . . TICKETS sent and you guys asking how i'm doing these cancalations [sic] IM NOT DOING ANY CANCELATIONS!!!!!" A few days later, on or about January 18, 2022, Pope messaged Lopez about the payment cancellations, and Lopez admitted that he was the "admin" who reversed the withdrawals.

82. On or about February 24, 2022, Pope told Lopez that a member of a Facebook group dedicated to exposing Cash FX's fraud showed Pope evidence

that Cash FX was paying TCP from Cash FX wallets containing pool participant funds. Lopez replied, "those are crap bullshit as they made all this up. We never paid both of your account wallet [sic] together with the rest of the members. so all they do is create fog and false testimonies in order to create fear." Pope replied, "Oh ya I know its all BS. I changed the wallets for payouts just to throw them off the trail."

### 3. In the Face of Extensive Public Warnings About Cash FX, Pope and Halladay Attempted to Explain Away These Warnings Without Confirming That Real Trading Was Occurring, Knowing or Recklessly Disregarding That Cash FX Was a Fraud.

83. Not long after the Individual Defendants began promoting Cash FX, financial regulators around the world began warning the public about Cash FX. For example, as noted above, on or about December 11, 2019, the UK Financial Conduct Authority issued a warning about Cash FX and to "beware of scams." During the Relevant Period, financial regulators from at least 19 countries issued public warnings about Cash FX.

84. Similarly, from the beginning of the Relevant Period, various other observers attempted to warn the public about Cash FX. For example, on or about July 23, 2019, the website BehindMLM.com called Cash FX a "200% to 400% ROI trading bot securities fraud," noting that "Cash FX Group has no retailable products or services" and that Cash FX was a "Ponzi scheme" that had provided "[n]o evidence of any trading." On or about April 1, 2020, the same website

reported that Cash FX was experiencing withdrawal delays, portending "imminent collapse." On or about April 2, 2021, the same website posted an article asserting that Cash FX's "master trader" was in fact a taxi driver. On or about November 19, 2021, the same website reported that Cash FX had suspended pool participant withdrawals.

85. On or about May 26, 2021, the U.K. Financial Conduct Authority banned EverFX (the supposed Cash FX "broker" who later disclaimed any affiliation with Cash FX) from offering certain high-risk products to U.K. investors, citing EverFX's misleading financial promotions.

86. In the face of these extensive public warnings and red flags, Pope and Halladay attempted to respond to them and downplay their significance, reflecting both their awareness of the public accusations regarding Cash FX and their knowing or reckless participation in the scheme. For example, in a video recorded on or about May 27, 2020, and subsequently posted to YouTube, Halladay and Pope made multiple false statements about Cash FX, expressly responding to allegations that no real trading was occurring. Halladay claimed that EverFX, a supposed "licensed registered broker," would not be working with Cash FX if Cash FX was not trading; and that "[w]e . . . know that there's real trades taking place because the Cash FX back office gives 100% transparency" about the trades that are occurring. Pope stated that he "heard the

rumors about Cash FX," but reiterated repeatedly that there were "no legal issues" with Cash FX. Further, Pope claimed that, in Panama, "one of the documents we gathered at that time was over 401 open trades on a trade sheet that I went over with the, uh, the legal team and they, uh, were blown away with the results." Pope could not have seen trade sheets reflecting actual Cash FX trading generating the types of profits Cash FX was claiming because Cash FX engaged in, at most, de minimis forex trading.

87. In a video recorded on or before June 16, 2020, and posted to YouTube on or about that date, Pope addressed allegations that Cash FX was a Ponzi scheme, falsely asserting that "[t]his company doesn't depend on new signups" and that "[t]his is a compliant company."

88. On or about January 31, 2022, Lopez recorded a video that was subsequently posted to YouTube. Lopez reassured pool participants that Cash FX was catching up on payments. Lopez explained that many MLM companies are scams that claim they were hacked as an excuse for delayed payouts, but that Cash FX really was hacked.

89. Pope and Halladay made the statements described herein knowing or recklessly disregarding that the statements were false. In addition to disregarding extensive public red flags about Cash FX, Pope and Halladay did not obtain or review sufficient information substantiating that Cash FX was

trading 70% of pool participant funds in forex markets throughout the Relevant Period, much less profitably. They did not obtain or review sufficient evidence substantiating that Cash FX was deploying AI and "expert advisor" trading software in the forex markets. They also did not obtain or review sufficient records substantiating Cash FX's operation as a legitimate business, rather than a Ponzi scheme.

### F. Pool Participants Suffered Massive Losses Resulting from Defendants' Fraud.

90. By late 2022, as described above, Cash FX was experiencing significant financial issues, failing to attract sufficient new Contributions to satisfy existing pool participants' growing demands for withdrawals.

91. On or about October 27, 2022, Cash FX began dissolution and liquidation proceedings in Panama. Cash FX, though Lopez and the other Defendants, however, continued operating, including by continuing to accept deposits from pool participants.

92. On or about May 12, 2023, the last known pool participant contributed funds to Cash FX.

93. On or about October 30, 2023, Cash FX took down its website.

94. Ultimately, while some Cash FX pool participants received Ponzi payments from Cash FX during the Relevant Period, pool participants suffered at least around $406 million in net losses.

95. Many, if not all, of the pool participants solicited by Defendants were not eligible contract participants ("ECPs") as defined in Section 1a(18) of the CEA, 7 U.S.C. § 1a(18)—*i.e.*, an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

**G. Cash FX Illegally Operated the Pool and Failed to Provide Required Disclosures.**

96. Cash FX, while acting as the commodity pool operator ("CPO") of the Cash FX Pool, failed to operate the Cash FX Pool as a legal entity separate from that of the CPO and commingled pool funds with non-pool property by transferring pool funds into wallets controlled by the Individual Defendants and others that contained non-pool funds.

97. In addition, Cash FX, while acting as the CPO of the Cash FX Pool, failed to provide pool disclosure documents, account statements presented and computed in accordance with generally accepted accounting principles and containing required information, and other documents to pool participants as required by Regulations 4.21 and 4.22, 17 C.F.R. §§ 4.21, 4.22 (2026). The documents required by those regulations included but were not limited to required cautionary statements, risk disclosures, fees and expenses incurred by

the Cash FX Pool, past performance disclosures, a statement that the CPO is required to provide all pool participants with monthly or quarterly account statements, and an annual report containing financial statements certified by an independent public accountant.

**H. Lopez Controlled Cash FX and Pope Controlled TCP.**

98. During the Relevant Period, Lopez was a controlling person for Cash FX. Lopez was the founder, Chairman, and owner of Cash FX. Lopez controlled the wallets that received pool participant funds in bitcoin and directed and controlled the disposition of that bitcoin, up to and including to whom and in what quantities payments were made back to pool participants. Welcome emails from Cash FX were signed by Lopez. Lopez signed agreements on behalf of Cash FX. Lopez opened and/or controlled accounts at Cryptocurrency Exchange #1 and other wallets and accounts utilized by Cash FX to receive, store, and disburse pool participant funds. Lopez did not act in good faith or knowingly induced Cash FX's fraudulent acts.

99. During the Relevant Period, Pope was a controlling person for TCP. During the Relevant Period, Pope served as the President and CEO of TCP. Pope signed agreements on behalf of TCP. Pope negotiated with lenders to borrow money for TCP. Pope opened and/or controlled wallets and accounts that received funds paid by Cash FX to TCP. Pope communicated with Lopez to

ensure payment to TCP. Pope did not act in good faith or knowingly induced TCP's fraudulent acts.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

**Violations of Section 4b(a)(2)(A)-(C) of the CEA, 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2026)**
**(Fraud in Connection with Forex)**

**(All Defendants)**

100. 7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, [. . .] that is made, or to be made, for or on behalf of, or with, any other person other than on or subject to the rules of a designated contract market –
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person;
>
> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]
>
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person . . . .

101. Cash FX offered pool participants, at least some of whom were not ECPs, forex agreements, contracts, or transactions on a leveraged, margined, and/or financed basis.

102. Pursuant to Section 2(c)(2)(C)(iv) of the CEA, 7 U.S.C. § 2(c)(2)(C)(iv), 7 U.S.C. § 6b applies to the forex agreements, contracts, or transactions offered by Defendants "as if" they were contracts of sale of a commodity for future delivery. Further, 7 U.S.C. § 2(c)(2)(C)(ii)(I) makes the forex agreements, contracts, or transactions here "subject to" 7 U.S.C. § 6b. Finally, 7 U.S.C. § 2(c)(2)(C)(vii) makes clear the Commission has jurisdiction over an account or pooled investment vehicle that is offered for the purpose of forex transactions described in 7 U.S.C. § 2(c)(2)(C)(i).

103. 17 C.F.R. § 5.2(b)(1)-(3) (2026) makes it unlawful for any person, by use of the mails or by any instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) to cheat or defraud or attempt to cheat or defraud any person; (2) willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

104. As described herein, each Defendant cheated or defrauded or attempted to cheat or defraud, and willfully deceived or attempted to deceive,

other persons in connection with Cash FX's offering of, or entering into, off-exchange leveraged or margined forex transactions with non-ECPs, by, among other things, engaging in the conduct set forth in the following paragraphs, all in violation of 7 U.S.C. § 6b(a)(2)(A), (C) and 17 C.F.R. § 5.2(b)(1), (3) (2026):

a. With respect to Lopez, paragraphs 18, 21, 50-51, 53, 62, 67, 88 (reflecting material misrepresentations and omissions), paragraphs 27, 35, 37-43 (reflecting misappropriation), and paragraphs 25-26, 29-30, 34, 44-46, 49, 59, 64-65, 73-82, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme).

b. With respect to Pope, paragraphs 18, 21, 50, 53-55, 59-60, 66, 86-87 (reflecting material misrepresentations and omissions), paragraphs 27, 35, 37, 42 (reflecting misappropriation), and paragraphs 25-26, 29-31, 33, 44-45, 47, 49, 64-65, 74-82, 89, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme).

c. With respect to Halladay, paragraphs 18, 21, 50, 52, 56-58, 61, 65, 86 (reflecting material misrepresentations and omissions), paragraphs 27, 37, 43 (reflecting misappropriation), and paragraphs 25-26, 44-45, 48-49, 59, 64, 66, 89, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme).

d. With respect to Cash FX, by and through Individual Defendants and/or other officers, employees, and/or agents, paragraphs 17, 18, 21, 50-62, 65-67, 86-88 (reflecting material misrepresentations and omissions), paragraphs 27, 35, 37-43 (reflecting misappropriation), and paragraphs 22, 25-26, 29-31, 33-34, 44-49, 64, 73-82, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme).

e. With respect to TCP, by and through Pope and/or other officers, employees, and/or agents, paragraphs 18, 21, 50, 53-55, 59-60, 66, 86-87 (reflecting material misrepresentations and

omissions), paragraphs 35, 37, 42 (reflecting misappropriation), and paragraphs 25-26, 29-31, 33, 44-45, 47, 49, 64-65, 74-82, 89, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme).

105. As described in paragraphs 68-72, Cash FX, (by and through Lopez, Pope, TCP and/or other officers, employees, and agents), and Lopez knowingly or recklessly made or caused to be made false account statements, all in violation of 7 U.S.C. § 6b(a)(2)(B) and 17 C.F.R. § 5.2(b)(2) (2026).

106. As described in paragraphs 13-15, 33, and 50, the foregoing acts, omissions, and failures by Individual Defendants occurred within the scope of their employment, agency, or office with Cash FX during the Relevant Period. Pursuant to 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. § 1.2 (2026), Individual Defendants' acts, omissions, and failures are deemed the acts, omissions, and failures of Cash FX. Accordingly, Cash FX violated 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) (2026) based on those acts, omissions, and failures.

107. As described in paragraphs 14 and 33, the foregoing acts, omissions, and failures by Pope occurred within the scope of his employment, agency, or office with TCP during the Relevant Period. Pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2026), Pope's acts, omissions, and failures are deemed the acts, omissions, and failures of TCP. Accordingly, TCP violated 7 U.S.C. § 6b(a)(2)(A)-

(C) and 17 C.F.R. § 5.2(b)(1)-(3) (2026) based on those acts, omissions, and failures.

108. As described in paragraph 98, Lopez held and exercised direct and indirect control over Cash FX and either did not act in good faith or knowingly induced Cash FX's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) (2026) during the Relevant Period. As a controlling person of Cash FX, Lopez is liable for Cash FX's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) (2026) pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b).

109. As described in paragraph 99, Pope held and exercised direct and indirect control over TCP and either did not act in good faith or knowingly induced TCP's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) (2026) during the Relevant Period. As a controlling person of TCP, Pope is liable for TCP's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) (2026) pursuant to 7 U.S.C. § 13c(b).

110. Each misrepresentation, omission of material fact, false statement, and misappropriation is a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) (2026).

## COUNT TWO

**Violations of Section 4*o*(1)(A)-(B) of the CEA, 7 U.S.C. § 6*o*(1)(A)-(B)**
**(Fraud by a CPO; Fraud by an AP of a CPO)**

**(All Defendants)**

111. As described in paragraphs 35 and 96-97, during the Relevant Period, Cash FX acted as a CPO, as defined by 7 U.S.C. § 1a(11), by soliciting, accepting, or receiving funds or property from the public while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in off-exchange, leveraged or margined forex transactions.

112. For the purposes of retail forex transactions, a CPO is defined in Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2026) as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract participant as defined in [7 U.S.C. § 1a(18)], and who engages in retail forex transactions." Cash FX was not an ECP as defined in 7 U.S.C. § 1a(18).

113. An AP of a CPO is defined by Regulation 1.3, 17 C.F.R. § 1.3 (2026), as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the

supervision of any person or persons so engaged. Throughout the Relevant Period, Individual Defendants acted as APs of CPO Cash FX by soliciting funds or property for participation in the Cash FX Pool and/or supervised other persons so engaged.

114. Further, pursuant to 17 C.F.R. § 5.1(d)(2) (2026), any person associated with a CPO "as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves: (i) [t]he solicitation of funds, securities, or property for a participation in a pooled vehicle; or (ii) [t]he supervision of any person or persons so engaged" is an AP of a retail forex CPO.

115. Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex, and accounts or pooled investment vehicles in retail forex, "shall be subject to . . . [7 U.S.C. § 6*o*]," except in circumstances not relevant here.

116. 7 U.S.C. § 6*o*(1)(A)-(B) prohibits CPOs and APs of CPOs, whether registered with the Commission or not, from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes, or artifices to defraud any actual or prospective pool participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any actual or prospective pool participant.

117. As alleged herein, Cash FX (a CPO) and Individual Defendants (as APs of CPO Cash FX) employed a device, scheme, or artifice to defraud pool participants and prospective pool participants, or engaged in transactions, practices, or a course of business which operated as a fraud or deceit upon any pool participant or prospective pool participant, by, among other things, engaging in the conduct set forth in the following paragraphs, all in violation of 7 U.S.C. § 6*o*(1)(A)-(B):

a. With respect to Lopez, paragraphs 18, 21, 50-51, 53, 62, 67, 88 (reflecting material misrepresentations and omissions), paragraphs 27, 35, 37-43 (reflecting misappropriation), paragraphs 25-26, 29-30, 34, 44-46, 49, 59, 64-65, 73-82, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme), and paragraphs 68-72 (reflecting provision of false account statements to pool participants).

b. With respect to Pope, paragraphs 18, 21, 50, 53-55, 59-60, 66, 86-87 (reflecting material misrepresentations and omissions), paragraphs 27, 35, 37, 42 (reflecting misappropriation), paragraphs 25-26, 29-31, 33, 44-45, 47, 49, 64-65, 74-82, 89, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme), and paragraphs 68-72 (reflecting provision of false account statements to pool participants).

c. With respect to Halladay paragraphs 18, 21, 50, 52, 56-58, 61, 65, 86 (reflecting material misrepresentations and omissions), paragraphs 27, 37, 43 (reflecting misappropriation), and paragraphs 25-26, 44-45, 48-49, 59, 64, 66, 89, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme).

d. With respect to Cash FX, by and through Individual Defendants and/or other officers, employees, and/or agents, paragraphs 17, 18, 21, 50-62, 65-67, 86-88 (reflecting material

misrepresentations and omissions), paragraphs 27, 35, 37-43 (reflecting misappropriation), and paragraphs 22, 25-26, 29-31, 33-34, 44-49, 64, 73-82, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme), and paragraphs 68-72 (reflecting provision of false account statements to pool participants).

118. As described in paragraphs 13-15, 33, and 50, the foregoing acts, omissions, and failures by Individual Defendants occurred within the scope of their employment, agency, or office with Cash FX during the Relevant Period. Pursuant to U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2026), Individual Defendants' acts, omissions, and failures are deemed the acts, omissions, and failures of Cash FX. Accordingly, Cash FX violated 7 U.S.C. § 6*o*(1)(A)-(B) based on those acts, omissions, and failures.

119. As described in paragraph 14, the foregoing acts, omissions, and failures by Pope occurred within the scope of his employment, agency, or office with TCP during the Relevant Period. Pursuant to U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2026), Pope's acts, omissions, and failures are deemed the acts, omissions, and failures of TCP. Accordingly, TCP violated 7 U.S.C. § 6*o*(1)(A)-(B) based on those acts, omissions, and failures.

120. As described in paragraph 98, Lopez held and exercised direct and indirect control over Cash FX and either did not act in good faith or knowingly induced Cash FX's violations of 7 U.S.C. § 6*o*(1)(A)-(B) during the Relevant

Period. As a controlling person of Cash FX, Lopez is liable for Cash FX's violations of 7 U.S.C. § 6*o*(1)(A)-(B) pursuant to 7 U.S.C. § 13c(b).

121. Each misrepresentation, omission of material fact, false statement, and misappropriation is a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)-(B).

## COUNT THREE

**Violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2026) (Fraud by Deceptive Device or Contrivance)**

**(All Defendants)**

122. 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

123. 17 C.F.R. § 180.1(a) (2026), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

124. Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex, and accounts or pooled investment vehicles in retail forex, "shall be subject to . . . [7 U.S.C. § 9]," except in circumstances not relevant here.

125. As described herein, in connection with agreements, contracts, or transactions in retail forex, and/or accounts or pooled investment vehicles in retail forex, each Defendant intentionally or recklessly: (i) used or employed, or attempted to use or employ, manipulative or deceptive devices or contrivances; (ii) made or attempted to make untrue or misleading statements of material fact or omitted to state a material fact; and/or (iii) engaged or attempted to engage in an act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, by engaging in the conduct set forth in the following paragraphs, all in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2026):

a. With respect to Lopez, paragraphs 18, 21, 50-51, 53, 62, 67, 88 (reflecting material misrepresentations and omissions), paragraphs 27, 35, 37-43 (reflecting misappropriation),

paragraphs 25-26, 29-30, 34, 44-46, 49, 59, 64-65, 73-82, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme), and paragraphs 68-72 (reflecting provision of false account statements to pool participants).

b. With respect to Pope, paragraphs 18, 21, 50, 53-55, 59-60, 66, 86-87 (reflecting material misrepresentations and omissions), paragraphs 27, 35, 37, 42 (reflecting misappropriation), paragraphs 25-26, 29-31, 33, 44-45, 47, 49, 64-65, 74-82, 89, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme), and paragraphs 68-72 (reflecting provision of false account statements to pool participants).

c. With respect to Halladay paragraphs 18, 21, 50, 52, 56-58, 61, 65, 86 (reflecting material misrepresentations and omissions), paragraphs 27, 37, 43 (reflecting misappropriation), and paragraphs 25-26, 44-45, 48-49, 59, 64, 66, 89, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme).

d. With respect to Cash FX, by and through Individual Defendants and/or other officers, employees, and/or agents, paragraphs 17, 18, 21, 50-62, 65-67, 86-88 (reflecting material misrepresentations and omissions), paragraphs 27, 35, 37-43 (reflecting misappropriation), and paragraphs 22, 25-26, 29-31, 33-34, 44-49, 64, 73-82, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme), and paragraphs 68-72 (reflecting provision of false account statements to pool participants).

e. With respect to TCP, by and through Pope and/or other officers, employees, and/or agents, paragraphs 18, 21, 50, 53-55, 59-60, 66, 86-87 (reflecting material misrepresentations and omissions), paragraphs 35, 37, 42 (reflecting misappropriation), and paragraphs 25-26, 29-31, 33, 44-45, 47, 49, 64-65, 74-82, 89, 91 (reflecting additional conduct in furtherance of the Cash FX Ponzi scheme), and paragraphs 68-72 (reflecting provision of false account statements to pool participants).

126. As described in paragraphs 13-15, 33, and 50, the foregoing acts, omissions, and failures by Individual Defendants occurred within the scope of their employment, agency, or office with Cash FX during the Relevant Period. Pursuant to U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2026), Individual Defendants' acts, omissions, and failures are deemed the acts, omissions, and failures of Cash FX. Accordingly, Cash FX violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2026) based on those acts, omissions, and failures.

127. As described in paragraph 14, the foregoing acts, omissions, and failures by Pope occurred within the scope of his employment, agency, or office with TCP during the Relevant Period. Pursuant to U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2026), Pope's acts, omissions, and failures are deemed the acts, omissions, and failures of TCP. Accordingly, TCP violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2026) based on those acts, omissions, and failures.

128. As described in paragraph 98, Lopez held and exercised direct and indirect control over Cash FX and either did not act in good faith or knowingly induced Cash FX's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2026) during the Relevant Period. As a controlling person of Cash FX, Lopez is liable for Cash FX's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2026) pursuant to 7 U.S.C. § 13c(b).

129. As described in paragraphs 99, Pope held and exercised direct and indirect control over TCP and either did not act in good faith or knowingly induced TCP's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2026) during the Relevant Period. As a controlling person of TCP, Pope is liable for TCP's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2026) pursuant to 7 U.S.C. § 13c(b).

130. Each material misrepresentation, material omission, or act of misappropriation made by Defendants is a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2026).

## COUNT FOUR

**Violations of Sections 2(c)(2)(C)(iii)(I)(cc), 4m(1), and 4k(2) of the CEA, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), 6k(2), and Regulation 5.3(a)(2)(i) and (ii), 17 C.F.R. §§ 5.3(a)(2)(i), (ii) (2026)**
**(Failure to Register as a CPO; Failure to Register as an AP of a CPO)**

**(Defendants Cash FX, Lopez, Pope, and Halladay)**

131. 7 U.S.C. § 6m(1) makes it unlawful for any CPO, unless registered with the Commission, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO. Similarly, 17 C.F.R. § 5.3(a)(2)(i) (2026) requires anyone acting as a CPO for a pooled investment vehicle that engages in retail forex transactions to register as a CPO.

132. Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) states in part, that:

> A person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 17, shall not . . .
> . . . .
>
> (cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [applicable retail forex agreements, contracts, or transactions].

133. Except in circumstances not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(i) (2026) require those that meet the definition of a retail forex CPO under 17 C.F.R. § 5.1(d)(1) (2026) to register as a CPO with the Commission.

134. As described in paragraphs 35 and 96-97, during the Relevant Period, Cash FX acted as a CPO by engaging in a business that was in the nature of a commodity pool, investment trust, syndicate, or similar enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or otherwise, for the purpose of trading in off-exchange leveraged, margined or financed forex transactions while failing to register with the Commission as a CPO, all in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. § 5.3(a)(2)(i) (2026). During the Relevant Period, Cash FX was not exempt from registration as a CPO.

135. 7 U.S.C. § 6k(2) makes it unlawful for any person to be associated with a CPO as an officer or agent (or any person occupying a similar status or

performing similar functions), in any capacity that involves the solicitation of funds, securities, or property for participation in a commodity pool, unless such person is registered with the Commission as an AP of a CPO.

136. Except in certain circumstances not relevant here, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(ii) (2026) require those that meet the definition of an AP of a retail forex CPO under 17 C.F.R. § 5.1(d)(2) (2026) to register as an AP of a CPO with the Commission.

137. As described in paragraphs 13-15, 33, and 50, throughout the Relevant Period, Individual Defendants were associated with CPO Cash FX as officers or agents in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, while failing to register with the Commission as an AP of the CPO Cash FX, all in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii) (2026). Throughout the Relevant Period, Individual Defendants were not exempt from the requirement to register as APs of a CPO.

138. 7 U.S.C. § 6k(2)(ii) makes it unlawful for a CPO to allow its agents or officers to solicit funds, securities, or property for participation in a commodity pool without such persons being registered as APs of the CPO, if the CPO knew or should have known that such persons were not registered as APs of the CPO.

139. As described in paragraphs 35 and 96-97, during the Relevant Period, Cash FX acted as a CPO and knew or should have known Individual Defendants were associated with it as officers or agents in a capacity that involved the solicitation of funds, securities, or property for participation in the Cash FX Pool, while failing to register with the Commission as APs of Cash FX, in violation of 7 U.S.C. § 6k(2)(ii).

140. As described in paragraph 98, Lopez held and exercised direct and indirect control over Cash FX and either did not act in good faith or knowingly induced Cash FX's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. § 5.3(a)(2)(i) (2026) during the Relevant Period. As a controlling person of Cash FX, Lopez is liable for Cash FX's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. § 5.3(a)(2)(i) (2026) pursuant to 7 U.S.C. § 13c(b).

**COUNT FIVE**

**Violations of Regulation 4.20(a)(1), (b), and (c),**
**17 C.F.R. § 4.20(a)(1), (b), (c) (2026)**
**(Failure to Operate Commodity Pool as a Separate Legal Entity, Failure to Receive Funds in the Pool's Name, and Commingling of Pool Funds)**

**(Defendants Cash FX and Lopez)**

141. 17 C.F.R. § 4.20(a)(1) (2026) requires a CPO to operate its commodity pool as an entity cognizable as a legal entity separate from that of the pool operator, with certain specified exceptions not applicable here.

142. As described in paragraph 96, during the Relevant Period, Cash FX, while acting as a CPO, violated 17 C.F.R. § 4.20(a)(1) (2026) by failing to operate the commodity pool as a legal entity separate from itself.

143. 17 C.F.R. § 4.20(b) (2026) provides, "All funds, securities or other property received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest or as an assessment (whether voluntary or involuntary) on an interest in a pool that it operates or that it intends to operate must be received in the pool's name."

144. As described in paragraphs 35 and 96, during the Relevant Period, Cash FX, while acting as a CPO, violated 17 C.F.R. § 4.20(b) (2026) by receiving funds from existing or prospective pool participants for the purchase of an interest in the pool without receiving the same in the pool's name.

145. 17 C.F.R. § 4.20(c) (2026) provides, "[n]o commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person."

146. As described in paragraph 96, during the Relevant Period, Cash FX, while acting as a CPO, violated 17 C.F.R. § 4.20(c) (2026) by commingling pool funds with the personal funds of Lopez.

147. As described in paragraph 98, Lopez held and exercised direct and indirect control over Cash FX and either did not act in good faith or knowingly

induced Cash FX's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) (2026) during the Relevant Period. As a controlling person of Cash FX, Lopez is liable for Cash FX's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) (2026) pursuant to 7 U.S.C. § 13c(b).

## VI. RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c(a) of the CEA, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A. Enter an order finding that Defendants violated 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A), (C), 6*o*(1)(A)-(B), 9(1), and 17 C.F.R. §§ 5.2(b)(1)–(3), 5.3(a)(2)(ii), 180.1(a)(1)–(3) (2026); further finding that Cash FX, Lopez, TCP, and Pope violated 7 U.S.C. § 6b(a)(2)(B); further finding that Cash FX, Lopez, Pope, and Halladay violated 7 U.S.C. § 6k(2); and further finding that Cash FX and Lopez violated 7 U.S.C. § 6m(1) and 17 C.F.R. §§ 4.20(a)(1), (b), (c), 5.3(a)(2)(1) (2026);

B. Enter an order of permanent injunction restraining, enjoining, and prohibiting Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and any other person or entity in active concert with them, from engaging in conduct in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A), (C), 6*o*(1)(A)-(B), 9(1), and 17 C.F.R. §§ 5.2(b)(1)–

(3), 5.3(a)(2)(ii), 180.1(a)(1)–(3) (2026); further restraining, enjoining, and prohibiting Cash FX, Lopez, TCP, and Pope, and any other person or entity in active concert with them, from engaging in conduct in violation of 7 U.S.C. § 6b(a)(2)(B); further restraining, enjoining, and prohibiting Cash FX, Lopez, Pope, and Halladay, and any other person or entity in active concert with them, from engaging in conduct in violation of 7 U.S.C. § 6k(2); and further restraining, enjoining, and prohibiting Cash FX and Lopez, and any other person or entity in active concert with them, from engaging in conduct in violation of 7 U.S.C. § 6m(1) and 17 C.F.R. §§ 4.20(a)(1), (b), (c), 5.3(a)(2)(i) (2026);

C. Enter an order of permanent injunction prohibiting Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and any other persons or entities in active concert with them, from, directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by 7 U.S.C. § 1a(40));

2) Entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3 (2026)), for accounts held in the name of Defendants or for accounts in which Defendants have a direct or indirect interest;

3) Having any commodity interests traded on Defendants' behalf;

4) Controlling or directing the trading for, or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2026); and

7) Acting as a principal (as that term is defined in Regulation 3.1, 17 C.F.R. § 3.1(a) (2026)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9) (2026);

D. Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedures as the Court may order, all benefits received, including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the CEA and

Regulations as described herein, including pre-judgment and post-judgment interest;

E. Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to make full restitution, pursuant to such procedures as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations described herein, including pre-judgment and post-judgment interest;

F. Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the pool participants whose funds were received by Defendants as a result of the acts and practices that constituted violations of the CEA and Regulations, as described herein;

G. Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* 17 C.F.R. § 143.8 (2026), or subsequent

annually adjusted amounts, for each violation of the CEA and Regulations, as described herein;

H. Enter an order directing that Defendants, and any third-party transferee and/or successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to pool participants and other persons in connection with commodity interests and all disbursements for any purpose whatsoever of funds received from commodity interests, including salaries, commissions, interest, fees, loans, and other disbursements of money or property of any kind from at least July 2019 to the date of such accounting;

I. Enter an order requiring Defendants, and any third-party transferee and/or successors thereof, to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

J. Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: September 24, 2026

Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

By: */s/ Rebecca S. Jelinek*
Rebecca S. Jelinek, Mo. Bar No. 53586
rjelinek@cftc.gov (Lead Counsel)
Anthony C. Biagioli, Mo. Bar No. 72434
abiagioli@cftc.gov
2600 Grand Blvd., Suite 210
Kansas City, MO 64108
(816) 960-7700

Attorneys for Plaintiff Commodity Futures Trading Commission